AND

*CORRECTION OF ERRORS,*

IN THE

## STATE OF NEW-YORK.

FEBRUARY, 1805.

*Daniel and Gulian Ludlow, appellants,*
against
*Lewis Simond, respondent.*

ALBANY,
February, 1805.

D. & G. Ludlow
v.
Simond.

ON appeal from a decision of the Chancellor, dismissing the appellants' bill with costs.

The appellants, on the 11th of *March*, 1799, entered into an agreement with *Angier Marie Leremboure*, and the respondent, by which, *Leremboure* was to load on board one or more vessels, such a quantity of tobacco and *Havanna* sugars, the former at 10 and a half and 11 cents *per lb.* the latter at 15 dollars 75 cents *per cwt.* for the brown, and 19 dollars for the white, as would form a capital of about 40,000 dollars, after deducting the drawback. The goods thus shipped, to be consigned, under a bill of lading, by *Daniel Ludlow & Co.* to Messrs. *Buildemaker & Co.* *their* correspondents at *Hamburgh*, to be sold for the

*If a surety engage to make good the deficiency arising from a sale of goods at a given place, and consigned to the correspondent of the person to whom the security is given, who has the whole controul of the adventure, a sale by the consignee at another place releases the surety. Though relief at law may be had, yet, if it be doubtful, equity will retain the bill.*

A.

account and risk of *Leremboure*. *Ludlow & Co.* to furnish *Leremboure* with their notes, to order, for the above amount of 40,000 dollars, payable, one-half at four, and the other half at six months; each half to be divided in several parts, to be delivered so as to complete each particular shipment, and the amount to be fully insured by one of the insurance companies, or other respectable underwriters, of the city of *New-York*.— For this, *Ludlow & Co.* to be allowed a commission of 2 1-2 *per cent*, on the invoices of the goods put on board.—To secure to *Ludlow & Co.* the repayment of the 40,000 dollars, together with the above commission, *Leremboure* to assign the policies covering the shipments, and in case of the capture or loss of any, *Ludlow & Co.* to receive from the underwriters the amount of their subscriptions. Should this mode of reimbursement not take place, *Ludlow & Co.* were authorised to draw at 60 days sight on *London*, twenty days before their notes respectively became due, at the then current exchange, and to order the necessary remittances to be made by *Buildemaker & Co.* to their friends in *London*, or to whom they may value on, to meet their drafts ; the remittances to be made at the risk of *Leremboure*, both as to the validity of the bills and solvability of the house in *London*, to whom the same might be made. *Ludlow & Co.* to be allowed a further commission of 1 1-4 *per cent* on the amount of all bills they might draw. If the proceeds of *the sales at Hamburgh, so disposed of,* should not prove sufficient to reimburse *Ludlow & Co.* the amount of their several notes, together with interest on their advances, commissions, and all other

charges, *Leremboure* to make good the deficiency, so soon as ascertained, by giving his note to *Ludlow & Co.* payable at 60 days, the same to be indorsed by *Simond & Co.* who thereby agreed thereto, *Ludlow & Co.* obligating themselves, if the proceeds of the several shipments exceeded the amount due them, to pay the difference when in cash ; the parties binding themselves to each other in the sum of 100,000 dollars for the due performance of the agreement, which was executed in the names of

ALBANY,
February,1805.

D. & G. Ludlow
v.
Simond

> DANIEL LUDLOW & Co. (L.S.)
> A. M. LEREMBOURE,    (L.S.)
> L. SIMOND & Co.       (L.S.)

In pursuance of the above contract, *Ludlow & Co.* on the day of the agreement, furnished *Leremboure* with three notes for 3,000 dollars, two for 2,500 dollars, three for 2,000 dollars, payable in six months, and one for 2,697 dollars 99 cents, at 4 months ; *Leremboure*, at the same time, assigning to them policies of assurance to the amount of 40,000 dollars on the cargoes of two ships loaded by him with sugar and tobacco, marked *D. L.* which were, by *Ludlow & Co.* consigned and ordered to be sold according to the terms of their engagement.   On the 6th of *April* following, *Ludlow & Co.* gave *Leremboure* other notes, making up the sum of 36,431 dollars 88 cents.

The cargoes thus shipped, and consigned to *Buildemaker & Co.* at *Hamburgh*, arrived safe, but previous to their reaching that port, several great failures had taken place, which induced a very considerable change in the market.   In consequence of this,

*Buildemaker & Co.* without any direction from the appellants, sent the tobacco to *Rotterdam*, addressed to their own correspondent, *Roquette Buildemaker,* who, in *July,* 1800, sold it for about 14,126 dollars 85 cents net, which he paid over to *Ludlow & Co.* In the *October* following, the appellants, having ascertained the balance due, presented the accounts of the sales of the tobacco to *Leremboure,* who acknowledged they were right, but, as he was then insolvent and confined for debt, declined giving his note for the deficiency, though the appellants demanded it. Sixty-three days after this refusal, *Ludlow & Co.* called on the respondent, and requested him to pay the amount of the loss, which he refusing to do, they filed their bill against him and the respondent, setting forth the above facts, charging a combination to refuse giving the note, praying that the accounts between them and *Leremboure,* arising under the agreement, might be taken, that *Leremboure* and the respondent might be decreed to make good the deficiency or balance, and that they themselves might be decreed such other relief as their case might require.

*Simond* put in his answer, stating, that without having any interest in the contract, or expecting to receive any benefit from it, he consented to become surety for *Leremboure,* and did, with him, execute the agreement in the name of *Lewis Simond & Co.* though, not having any partner, he himself was solely bound by the signature. The answer, also, admitted the facts as detailed, except as to the effect of the failures at *Hamburgh,* of which it stated his ignorance, but averred, that the reshipment of the tobacco for *Rotterdam,* and sale of it there, was without the consent

of *Leremboure* or himself ; in consequence of which, ALBANY,
February,1805.
*Leremboure* refused to give the note mentioned in the
agreement, and he to pay or make good the deficien- D. & G.Ludlow
v.
Simond.
cy, considering themselves released from all obliga-
tion to do the one or the other.

To establish the price of tobacco at *Hamburgh*, in
the summer of 1799, *I. L. Steinbach* and *John H.
Schmidt* were examined, but the first could prove
nothing as to the point, and the latter, only that *Vir-
ginia* tobacco, at *Hamburgh*, was, from the month of
*October*, 1799, to the end of the year, at 3*s.* 9*d.* to 4*s.*
*Hamburgh* currency, *per lb.* that *Maryland* was high-
er, and that the price continued the same in 1800,
but what it was in the summer of 1799 he could not
tell.

To prove the execution of the agreement *William
M. Seton* and *Martin Hoffman* were examined, who
deposed, that they saw " *Daniel Ludlow* and *Gulian
Ludlow*, the complainants, and *Angier Marie Lerem-
boure* and *Lewis Simond*, execute the contract."

The cause being heard, on the above admissions
and testimony, his honour the Chancellor pronounced
the decree, now appealed from, and thus assigned his
reasons :

*Mr. President.* On this case several questions have
been made, but a preliminary consideration is—

Whether the bill can be sustained in this court ?

The informality in the execution of the contract,
might, of itself, be sufficient to repel the allegation,
that the matter in the bill is not cognizable here, as it
was determined while I was in the supreme court,* *Becker* v. *Kirk*
that an execution of a sealed instrument by one part- *July term,*1791.

ner, in the name of the firm, was invalid, and it was for that reason rejected as evidence. But in this case it is not necessary, nor do I mean to ground my opinion on that point, for there is another head of equity which must sustain the bill.

The defendant, *Leremboure*, has refused to give his note, and it does not appear to me that any form of pleading at law, would enable the complainants to allege the not indorsing a note *which never was in existence*, as a breach of contract by the defendant, *Simond*, or as cause of action in any other shape; the making of the note would there, as to the defendant, *Simond*, be considered in the nature of a condition precedent; and if it could be made out in proof, that the not making it was the effect of fraud or collusion, it would, perhaps, not better the condition of the complainants, for it would then become one of the peculiar objects of the jurisdiction of this court, but there certainly could be no valid reason for coming here to account, as the accounting in this case can only be required from the complainants.

I, therefore, proceed to consider the questions applying to the merits; these are—

1st. Whether the agreement was a valid one, as the complainants are described as *Daniel Ludlow & Co.* and have executed it with one seal only?

2d. Whether the house of *Buildemaker & Co.* were the joint agents of both, or the agents of either exclusively?

3d. Whether the defendant, *Simond*, was an original party in interest in the contract, or only introduced as surety? and if as surety,

4th. Whether the deviation from the terms of the contract in its execution, has not discharged him? and,

ALBANY,
Feb. uai y, 1805.

D. & G. Ludlow
v.
Simond.

5th. It has been insisted, that as the defendant, *Simond*, is not liable at law, this court will not carry his responsibility beyond it.

As to the first question, if the contract was invalid, as to the complainants, the consideration on the part of the defendants must have failed also, and of consequence it was insisted the whole transaction was nugatory.

To the contract, appears the signature of " *Daniel Ludlow & Co.*" collectively, as one of the parties ; both the complainants, however, were present, and the subscribing witnesses depose, that *both executed it.*

Whether this inference was drawn from the erroneous opinion, that the act of one copartner may bind the other in all cases, respecting their common concerns, *whether the act is with or without seal*, or whether they both actually and formally sealed and acknowledged the instrument as their act and deed, cannot be determined from the depositions—it is a fact proved that both executed it.

The signature of the contracting parties, is in the ordinary and regular form; but it is not an essential part of the execution : the sealing and delivery are of its essence, and I know of no law which will prevent a plurality of parties from acknowledging one seal affixed to an instrument, as the seal of each party separately ; for the mere recognition of a seal does not, in its modern use, amount to an exclusive appropriation, so as to prevent the other parties to the instrument,

from using it as their own, for all the purposes of giving validity to the deed, to which it is affixed, as their act; but in this instance, whether the paper in question is considered as a deed, or depending upon the principles regulating simple contracts, will not vary its operation. Before it assumed the shape of a deed, and had the formalities attending its being constituted such, attached to it, the contract had received a definite complexion. The terms had been arranged and precisely ascertained by the convention of the parties, and it would emphatically be entangling justice in the net of form to sustain an objection on that ground here—for the existence and terms of the contract are the only objects, as far as respects this point in contest between the parties; and that these were authenticated with a greater degree of formality, than the strict rules of law require, cannot certainly detract from the evidence of its existence.

It will be perceived, that I do not rely on the acts of the parties in its execution, which might, in all events, have a determining effect in one point of view; that I do not now mean to pursue.

As to the second question.

To determine this, it may be necessary to examine the general scope and object of the contract, and to review its different details.

The leading motives of the defendant, *Leremboure,* seem to have been, to avail himself of the agency of the complainants, perhaps as a protection against the captures of belligerents, and the reduction of the premium of insurance, and certainly of their credit, to give him an earlier command of the funds, ex-

pected to arise from the consignments of his sugars and tobacco to *Hamburgh*, and on the part of the complainants, the receipt of the commission stipulated by the contract.

The contract was so arranged, as to afford the complainants every reasonable security against ultimate loss, and much more so than could apply to ordinary commercial speculations, if the business was correctly managed, according to the directions contained in the contract.

It multiplied the guards against loss by reposing, first, on the responsibility of *Leremboure ;* secondly, and principally, on the subject consigned ; and thirdly, on the defendant, *Simond,* whose ability to respond does not appear to be questioned.

The contract stipulates, that *Leremboure* shall put on board one or more vessels, tobacco and sugars, at *fixed prices,* to the amount of about 40,000 dollars ; that those goods shall be consigned under bills of lading *of the complainants,* to *Buildemaker & Co. their correspondents at Hamburgh,* to be sold for the account and risk of the defendant, *Leremboure ;* that he shall insure them, and assign the policies of insurance to the complainant, who shall receive from the underwriters the amount of any losses which shall be applied to the reimbursement of the complainants.

The complainants agree to furnish their notes to the defendant, *Leremboure,* to the amount of the several shipments, fully insured, one half payable in four, the other half in six months, and to pay any surplus which may remain, after they have been satisfied, to *Leremboure.*

B

If the policies did not afford a means of reimburse-
ment, then the complainants were authorised to draw,
*twenty days before their notes became due*, at the
then current exchange, at 60 days on *London*, and to
*order the necessary remittances to be made by Builde-
maker & Co.* to their friends in *London*, on whom
they might value, to meet their drafts—for which
the complainants were to receive an additional com-
mission of one and one quarter per cent, on the
amount of such drafts.

If the proceeds of the sales *at Hamburgh*, should
prove inadequate to reimburse the complainants, the
*defendant, Leremboure, agreed to make good the defi-
ciency* as soon as ascertained, by giving his note to
the complainants, payable at 60 days, and then fol-
lows, " the same to be *indorsed by L. Simond & Co.*
who hereby agree thereto."

The house of *Buildemaker & Co.* are described
*as the correspondents of the complainants* at *Ham-
burgh*—the complainants are authorised to order the
necessary remittances to be made by that house, to
*London*—they were to consign the tobacco and su-
gars, which were particularly valued, under their
(the complainants) names, to the same house—the
policies were to be assigned to them—*Buildemaker
& Co.* were to make a selection of a house in *London*,
to which the remittance was to be made by them,
from *Hamburgh*, though that remittance was to be
made, both as to the validity of the bills and solvabili-
ty of the house in *London*, at the risk of the defend-
ant, *Leremboure.*

All these are strong marks of a determination com-
pletely to devolve the controul of the subject upon

the complainants—of a total abandonment of the right of interfering in the management of the fund, destined to secure the complainants against the responsibilities they might incur, until its disposition should have been effected; and after this was consummated, the defendant, *Leremboure*, was even to receive the surplus from the hands of the complainants, and not from *Buildemaker & Co.* to whom a resort must of course have been had, if they were the joint agents of the parties.

ALBANY,
February, 1805.

D. & G. Ludlow
v.
Simond.

The description of *Buildemaker & Co. as correspondents* of the complainants, in mercantile language, is somewhat more forcible than in common parlance —it indicates persons with whom they were in the habit of doing business, and in this instance it can only have been introduced to show, that in the capacity of the correspondents or agents of the complainants, they were to be entrusted with the management of the concern.

If that were not the case, one of the links in the chain of security, which the complainants evidently intended to rely on, would have been effectually broken.

The assignment of the policies of insurance was intended to afford a fund for the complainants' indemnity, in case of loss *in transitu.* Upon the arrival of the subject at its destined port, it was to be committed to the *complainants' consignees,* at the risk and for the *ultimate* account of the defendant, *Leremboure* —but *exclusively* subject to the disposition of the complainants ; *for* they were authorised to order the proceeds *to be remitted to London,* and unless this could be done without the interruption or controul

ALBANY,
February, 1805.

D. & G. Ludlow
v.
Simond.

of the defendant, *Leremboure*, the fund, on the credit of which the complainants had given their notes, might have been withdrawn, and none left to satisfy the bills which they were authorised to draw on that place.

As to the third point.

The introduction to the contract is, " that *it is agreed between the subscribers ;*" this comprised all the parties.

Every subsequent article, the last excepted, on the part of the defendant, is *exclusively* imposed on, or for the benefit of the defendant, *Leremboure*— he is to ship the tobacco and sugars, which are to be sold for his account and risk—he is to assign the policies—he is to be at the risk of the remittances —he is to make good the deficiencies, and he is to receive the surplus, if any.

It has, therefore, notwithstanding this general introduction, a partitive effect ; it contains a detail of the stipulations between the complainants and the defendant, *Leremboure*, particularly prescribing the duties and obligations intended to be thereby imposed on each, and then, as a final clause, the defendant, *Leremboure*, " agrees to make good the deficiency as soon as ascertained, by giving his note to *D. Ludlow & Co.* payable at 60 days, the same to be indorsed by *L. Simond & Co. who hereby agree thereto*"—which is an additional indicium of the intent that the defendant, *Simond*, should only be held to pay, if the defendant, *Leremboure*, did not —the relation of principal and surety is strongly inculated from this circumstance, and the whole tenor of the contract appears to me to support the same.

construction. I am therefore of opinion, that the defendant, *Simond*, is to be considered merely as a surety.

This brings me to the fourth question.

It may tend to elucidate this point, to ascertain the time and place in which the acts preparatory to the liability of the defendant, *Simond*, were to be performed.

1. As to the time.

The contract bears date the 11th day of *March*, 1799; it contains no particular limitation when the shipments were to be made—but it seems, the tobacco and sugar were ready for exportation, as the notes were to be furnished when each particular shipment should be completed, one half payable in four, the other half in six months. It appears that two different shipments were made on the 11th of *March*, (the date of the contract) and the 6th of *April*, 1799, at which time the notes stipulated by the contract were given— the complainants by its terms were authorised to draw on *London*, at 60 days, *twenty days before the days whereon the notes* were limited to be paid, and to direct a remittance of the proceeds of the sales to be made from *Hamburgh* to *London*, to satisfy the bills drawn on the latter place ; these shipments, on the data furnished by the contract, would authorise the complainants to draw, in the months of *June* and *August*, for the first, and in *July* and *September*, 1799, for the second—periods which, with the necessary allowance for the transmission of the bills and the 60 days at which they were to be drawn payable, are the criteria from which the intent of the parties, as

to the consummation of the transaction, is to be col-
lected.

As to the place.

The consignment was to be made to *Buildemaker
& Co.* at *Hamburgh*—the proceeds of *the sales at
Hamburgh,* are spoken of in another part of the con-
tract—the remittance was to be made by *Builde-
maker & Co.* to *London,* the shipments were made to
*Hamburgh,* and the insurance limited to that place—
all these circumstances pointed to *Hamburgh,* in its
locality, for the conversion of the articles shipped,
into money, and from which the remittance was to
be made.

The time might vary according to circumstances,
but an unwarrantable delay, though it might have
promoted the advantage of the defendant, *Lerem-
boure,* if he had remained solvent, might be very
prejudicial to the defendant, *Simond,* who would
thus be prevented from taking measures for his in-
demnity, which a sense of danger would have prompt-
ed, and instead of depending upon an insolvent, he
might have been placed at least in a situation to strug-
gle for a plank in the shipwreck. This he is now
totally precluded from—it is therefore incumbent on
the complainants to show that they have been so vi-
gilant as not to subject him to loss by the non-exe-
cution, or delay in the execution of the powers which
they had a right by the contract to exercise, and
which it is of no consequence to the defendant,
*Simond,* whether delayed by the act of the complain-
ants solely, or the joint act of the parties in interest,
as the consent of one or both could not vary his

situation, or the precise measures of his responsi-
bility.

The sale of the 169 hogsheads of tobacco took
place on the 3d of *July*, 1800, probably more than a
year after its arrival at *Hamburgh*, for no part of the
evidence ascertains the time of its arrival.  During
all this time the defendant, *Simond*, was unapprised
of the result of the speculation, and precluded from
taking the necessary steps to protect himself from
loss.  So far as respects the place, there is a palpable
departure from the terms of the contract, not even
satisfactorily explained on the ground of its being ad-
vantageous—for the depositions to this point leave
the subject where they found it ; that of *Joachim
Ludwig Steinbach*, does not touch the period during
which the tobacco was at *Hamburgh* or *Rotterdam*,
and that of *John H. Schmidt*, states the price of *Vir-
ginia* tobacco from the month of *October*, *eight months*
after it was embarked for *Hamburgh*, from 3 1-4 to 4
*shillings Hamburgh* currency, *per lb.* and though it
has been admitted, that failures of great extent took
place at *Hamburgh* about the time the tobacco, in
question, arrived at that place, there is no proof of the
influence of that circumstance, on the state of the
market, nor any reason given why it should affect the
tobacco and *not the sugars.*

Indeed, if the evidence given in this cause was
apposite, it would show there was a market for to-
bacco in *Hamburgh*, and that the prevailing price at
that place might or might not, according to the differ-
ent constructions of which this indistinct evidence is
susceptible, have been more than the sales ultimately
made at *Rotterdam.*

The consideration of loss occasioned by parting with money to the principal, in consequence of a re-liance on a surety, is as valid and meritorious in all legal and equitable views, as a benefit or profit ac-quired by the surety personally, and as on the one hand the surety ought to be held, perhaps, with more or less strictness, according to circumstances, to his engagements; so, on the other, the surety's risk ought not to be increased, or his contract varied to his pre-judice.

The latter of these positions has been repeatedly recognised in the British courts, and though most of the cases bearing on this point, were adjudged since the revolution, and so no authority here, the princi-ples laid down in them as far as they are necessary to be applied to the present point; that a surety cannot be carried beyond his contract; that the contract made by the parties must be judged of, and not ano-ther substituted in its stead ; that it cannot be varied without his consent, and that a surety for definite en-gagements shall not be extended to an indefinite one, appear to me correct.*

* 2 *Term Rep.* 372. 7 *Term Rep.* 256. 2 *Brown's Ch. Ca.* 579. 2 *Vezey, jun.* 540.

These must form solid grounds of equity, by which, if this cause is tested, there is no pretence for charg-ing the defendant, *Simond.*

Here the defendant, *Simond,* became bound for a definite object to respond for deficiencies in sales made *at Hamburgh* in a reasonable time. The com-plainants seek to charge him for deficiencies arising on sales made at *Rotterdam* at a later period than the contract contemplated, a totally different mart, sub-ject to a different government and laws, exposed to some additional risk, and certainly to additional ex-

pense, from the change of place, and the inconve- nience of a change of agents, not entrusted by the parties; for the accounts of sales are subscribed *Roquette Buildemaker,* and not by the firm of *Builde- maker & Co.*

If it was proper to send the subject to *Rotterdam,* I know of no principle that could have restrained it from being sent to *London,* or even to *Canton,* in quest of a better market.

Upon mature reflection, and a deliberate review of all the circumstances attending this case, I am strong- ly impressed with the opinion, that the defendant, *Simond,* is not chargeable, and that as to him, the complainants have not sustained their bill, and it must, therefore, be dismissed with costs.

*Woodworth, Attorney General,* for the appellants. Before the merits of this case are approached, it may be necessary to establish that the suit was rightly commenced in the court of chancery, as the fit and proper tribunal. Equity, has, in many instances, a concurrent jurisdiction with the common law, but it is invariably the *forum* to which recourse is to be had, wherever, upon the principles of universal jus- tice, the interference of a court of judicature is " ne- cessary to prevent a wrong, and the positive law is silent." 1 *Fonb.* 10. *n. (f).* In matters of account it has almost exclusive jurisdiction, and the mere circumstance of its being requisite to state one, has been held sufficient to warrant a bill. 2 *Eq. Ca. Abr.* 4. Here the basis of the notes to be given, was a balance, that could be ascertained only, by an ac- count. Besides, the refusal of *Leremboure* to give

* *Le Neve* v.
*Le Neve.*

† *Weymouth* v.
*Boyer.*

the note *Simond* was to indorse, might be the result of combination and fraud, which chancery alone could discover, and relieve. Any suspicion of trick, deceit, and contrivance, is sufficient to give to chancery cognizance of the suit. 3 *Atk.* 654.* If there was any doubt hanging over the case, whether a court of law was adequate to all its emergencies, it would afford acknowledged reason for equitable interposition. 1 *Ves. J.* 424.† It might have been made a question how far the contract, being signed only by one of the appellants, and having but one seal affixed, could be enforced at law. But as it is proved to have been executed by both *Daniel and Gulian Ludlow*, this point cannot now be insisted on, as it is to be inferred they severally appropriated the same seal to themselves. This would be a valid execution by both. In *Ball* v. *Dunsterville*, 4 *D. & E.* 313, a single seal used by one partner, with the assent of the other, in the name of both, was held obligatory on each. Allowing, however, that there was a remedy at law, that does not of itself oust chancery of jurisdiction. In *Billon* v. *Hyde*, 1 *Atk.* 128, a verdict, in an action for money had and received, was not deemed to preclude from a recurrence to equity; because the subject of discussion involved matters of contract and account. Nay, though the very reason assigned for going into chancery, be such as the chancellor himself would have allowed the benefit of at law, it does not prevent an application to equity; because it is possible the judge before whom offered, might be of a different opinion. *Burrows* v. *Jemimo*, 2 *Str.* 733. In mercantile transactions relating to agents and

factors, a concurrent jurisdiction has always been exercised. 3 *Black. Comm.* 437. So where a bond was lost, there was formely no remedy but in chancery. 1 *Ch. Ca.* 77.* The law is otherwise now, but still relief may be sought as before; and as the present is, perhaps, a case of suretyship, equity is the most appropriate tribunal; for a surety, not liable at law, may be so there; as if his name be not mentioned in the body of an obligation which he has signed. *Crosby* v. *Middleton and others, Prec. in Chancery,* 309. So equity will in many cases set up against a surety, debts extinguished at law. *Skip* v. *Huey,* 3 *Atk.* 93. But however forcible the argument against the jurisdiction might have been, it is too late to urge it now. The respondent should have taken advantage of it *primo die,* by plea in abatement. He cannot avail himself of it, after answering and proceeding to a hearing; for by so doing, he has submitted to the jurisdiction. *Penn* v. *Lord Baltimore,* 1 *Vez.* 447. The merits are grounded chiefly on *Simond's* being but a surety. This, it may be observed, does not expressly appear, and as it is enforcing very strict rules to do away the effect of a contract, the *onus probandi* lay on the respondent. He should have substantiated this by witnesses; for by the instrument it is left in doubt, though it may be inferred. Inference, however, ought not to decide this question; it must turn on the construction of the agreement. The rule on this subject is, that the intent ought to govern. 1 *Fonb.* 427. 3 *Atk.* 136.† *Kaimes's Prin. of Eq.* 204, 239. To effectuate this, equity is more liberal than a court of law. 2 *Atk.* 581.‡ The security of the appellants, was the object of every part of the

ALBANY,
February,1805.

D. & G. Ludlow
v.
Simond.

* *Underwood* v.
*Staney.*

† *Smith* v.
*Parkhurst.*

‡ *Bagshaw* v.
*Spencer.*

contract. The moderate compensation they were to receive, is a proof of this. A commission of 2 1-2 *per cent* could never be meant as an indemnity for any hazard whatsoever. The goods are to be sold *at the risk of Leremboure.* It was intended there-foi e, that no loss, resulting from the sale, should be thrown on the appellants. *Simond* assents to this, and guarantees against it. That the property should be sold at *Hamburgh,* was not of the essence of the contract. The goods were to be sent to *Hamburgh, to be sold,* and not to be sold *at Hamburgh.* It was too rigorous to say, that the agents there, had not a discretionary power to send the consignment to a better market. Whatever was *bona fide* done, for the advantage of the principals, is to be protected. It is a mistake to imagine that *Buildemaker & Co.* were the exclusive agents of the appellants. The contract speaks the language of all the parties to it, and that says, the goods shall be sent to *Buildemaker & Co.* They were, therefore, as much the agents of the respondent, as of the appellants. *Leremboure* consents that they shall sell for him, and at his risk. What is this but constituting that house his agent, and with the approbation of *Simond?* If this fact be admitted, it is immaterial whether the agents were authorised to send the goods to *Rotterdam* or not, because it was then the act of the respondent. Allowing, however, that *Buildemaker & Co.* were the agents of the appellants only, and that they had no right to sell at any other place than *Hamburgh,* still the consequences insisted on would not follow. The utmost that could be claimed, would be a deduction adequate to the actual

loss sustained by the breach of duty. Here it is ma-
nifest from the account of sales, that there has been a
gain by changing the place of sale. Notwithstanding
this, the respondent loudly insists, that because he is,
from our management, liable to less than he would
otherwise have had to pay, he is therefore responsi-
ble for nothing. Is this a defence to be endured in
equity? It will never surely be urged, that from the
period at which the sales took place, *Simond* is released.
The contract limits no time, within which they were
to be made. Where then is the authority for making
it criminal to sell in one month more than in another?
A suretyship not restrained within given periods, is
not discharged by lapse of time. 1 *Bos. and Pull.*
419.* Should the court be of opinion, that the cause
rests on the fact of the property not having sold for
more at *Rotterdam*, than it would have produced at
*Hamburgh*, an inquiry may be directed on that
point, in the same manner as in cases of accounts;
it is not unusual to refer them to two merchants.
*Gyles* v. *Wilcox.* 2 *Atk.* 144.

*Hoffman, Henry, Van Vechten,* and *Edwards,* contra.
The questions in this case, ought to be considered
without reference to *Leremboure*, whose acts are not
to affect *Simond*, the only real respondent. He, it is
evident, on viewing the contract, which is consistent-
throughout, could be no more than a surety. He has
no kind of beneficial interest. Neither in profits nor in
commissions does he participate. The only charac-
ter in which he appears, is that of a guarantee against
loss. He has only one solitary act to perform, that of
making good any deficiency duly incurred, and legal-
ly ascertained. To constitute a man a surety, it is
not necessary that in the instrument he should be

<div style="text-align: right">

ALBANY,
February, 1805.

D. & G. Ludlow
v.
Simond.

*Peel* v. *Tatlock.*

</div>

ALBANY,
February,1805.

D. & G.Ludlow
v.
Simond.

named as such.   If, from its nature or condition, it can be collected, it is sufficient.   *Lord Arlington* v. *Merricke*, 2 *Saund.* 411, and the authorities *in notis.* If, then, the respondent be a surety, of which there seems to be no doubt, he cannot, as all the court held in *Wils.* 539,* be bound beyond the strict letter of his contract.   The same principle is acknowledged in 1 *D. & E.* 291. *n.* (*a*).† Nor is it extended in equity; for it is there settled, that if not bound at law, a surety shall not be liable there. 1 *Vern.* 196.‡ 2 *Vern.* 393.§ 2 *Ch. Ca.* 22.¶ The reason of these cases is, that sureties have no beneficial interest. They merely exercise their bounty and good will, without consideration.   The securities, therefore, into which they enter, stand on the same footing, as voluntary conveyances, which are never helped in equity. 2 *Vent.* 365.*   For, before that tribunal, the very motives on which they engage, render them, in all cases, favourites of the court.   On this point, every authority cited is a proof.   As to the case of *Skip* v. *Huey,*† that relates only to securities destroyed or lost, by fraud or accident.   It does not warrant the extension of a security.   And though *Crosby* v. *Middleton*‡ seems to be against our positions, that case may well be doubted, for in 1 *Fonb.* 38 *n.* (*w*) it is queried, and *Sheffield* v. *Lord Castleton* is almost directly in opposition.   As, then, *Simond* is only a surety, and sureties are never, even in equity, liable beyond the letter of their engagements, it will be now incumbent to show, what, by the letter of the present engagement, *Simond* contracted to perform—to make good such deficiency as should arise on the sales of the cargo

*Wright v. Russel.

†Barclay v. Lucas.

‡ Ratcliffe v. Graves.
§ Sheffield v. Ld. Castleton.
¶ Simpson v. Field.

* Bonham v. Newcomb.

† 3 Atk. 93.

‡ 3 Ch. Rep. 55.

at *Hamburgh*. That was the spot at which they were to be made. It is reasonable that a mercantile man, should guarantee the proceeds of a sale at one market, who would, by no means, be responsible for the result at another. The insurances were made no further than to *Hamburgh*, and this alone evinces that the adventure was to be terminated there. The contract, therefore, was varied by sending the goods to *Rotterdam*. It transferred the property from a neutral port to that of a belligerent, and took it out of the security of one, to expose it to the various dangers of the other. This procedure extended, also, the period for which *Simond* was bound. It protracted to more than a year the concluding a speculation, the termination of which, by the words of the contract, was never contemplated to exceed six months. The respondent was, therefore, released. *Nisbet* v. *Smith*, 2 *Bro. Ch. Rep.* 584. *Rees* v. *Berrington*, 2 *Ves. J.* 542. Against this conclusion it is urged, that *Buildemaker & Co.* were the agents of *Simond*, at least of him and *Leremboure*, or, if not so, then of all parties; but, that they could not be considered as the exclusive representatives of the appellants. The object of the contract, and its various parts, show that *Buildemaker & Co.* were the agents of *Ludlow & Co.* alone. They were the correspondents of the *appellants*—the shipments were under *their* mark—they were consigned by *them*—the remittances to be according to *their* order—the accounts to be rendered to *them*. In short, *they* were to have the whole controul of the adventure, and under *them Buildemaker & Co.* to act, unamenable to, and without any interference of, *Leremboure* or *Simond*. How then could *Buildemaker & Co.* be the agents of persons they never knew,

ALBANY,
February, 1805.

D. & G. Ludlow
v.
Simond.

.of principals by whom they were not to be directed, and to whom they were never to account? It follows, therefore, that they were exclusively the agents of the appellants, who, and not *Simond*, must bear the loss arising from sales made in violation of the contract. For, it was by the *Ludlows* that confidence was placed in *Buildemaker & Co.* and the rule in equity is, that " he who trusts most shall lose most." 3 *Atk.* 93.*

*Skip v. Huey.

Another reason, against the claim of the appellants, arises from the very manner in which *Simond* consented to be liable. He engaged to indorse such note as *Leremboure* should give for such deficiency as should be ascertained on sales at *Hamburgh*. Suppose a note had been given by *Leremboure*, and on the respondent's refusal to indorse, an action of covenant, which, indeed, is the true and only remedy, had been brought for the breach of contract, would not the plaintiff have been obliged to aver, that the sales were made at *Hamburgh*, the deficiency on such sales ascertained, and the making of the note? These various circumstances must, therefore, be deemed conditions precedent to the liability of *Simond*; and if so, he cannot be responsible till they are performed. For, where a condition is precedent, it must be shown to have

†Ughtred's case.

been literally fulfilled. 7 *Rep.* 9 to 11.† It admits of no equivalent, because it is stricti juris. 5 *Vin. Abr.* tit. condition. 145 pl. 27. Co. Litt. 218, (a). Nothing can be argued from the acknowledgments of *Leremboure*, stated in the case. The contract of one man cannot be varied by the act of another. If I enter into a bond to pay such sum as A. shall, after 8 days warning to appear, be condemned in, if A. appear without notice and be cast, my bond will not be for-

‡ Hargrave v. Rogers, cited by Holt, Ch. J. in Booth v. Johnson.

feited. 7 *Mod.* 144.‡ On every point, therefore, sup-

posing the court below had cognizance of the matter, the decision was correct. But we contend, the appellants had no right to ask the interference of that tribunal, and that the dismissal of the bill, if improperly ordered on the grounds taken by the Chancellor, must now be directed, for want of jurisdiction. Redress was open at law, in an action for damages. There alone it ought to have been sought, and there every satisfaction might have been obtained. On the principle of account, the bill could never have been sustained ; because of no privity in *Simond* with respect to any of the transactions. Nothing rested in his knowledge which he could disclose, and he, consequently, was not liable to be called to an account in Chancery. *Com. Di. tit. Chancery*, 2 *A.* throughout. 2 *Fonb.* 182, 3 note (*n*) 1 *Eq. Ca. Abr.* 5 note (*n*) also. The concurrent jurisdiction of equity, in matters of account, arises only from the right to obtain a discovery, in which case, the bill is retained for the purpose of relief. 1 *Fonb.* 10 *n.* (*f*) But what discovery can be obtained from *Simond?* The prayer of the bill is, in fact, for damages; not for a specific execution, and carries, therefore, in itself, a convincing proof, that the application ought to have been to another *forum.* The authorities cited to establish that it is now too late to urge any thing against the jurisdiction, only prove, that when a defendant does not, in his answer, make the cognizance of the court a point, he waives it—not that he cannot urge it in his answer. A defendant may, in his answer, insist upon his law. 3 *P. W.* 95.* *Hinde* 200. 2 *P. W.* 238.† The omission of a defendant, will not confer jurisdiction.

D

ALBANY,
February, 1805.

D. & G. Ludlow
v.
Simond.

* *Harris* v. *Ingledew.*
† *Wrotsley* v. *Bendish.*

ALBANY,
February, 1805.

D. & G. Ludlow
v.
Simond.

*Pendleton* and *Harison*, in reply. It is a principle of chancery, that, on a bill to account, both parties are actors, and, therefore, if *Ludlow & Co.* were alone to render one, still it would be a proper mode; for, it often happens that, from motives of prudence, a trustee has recourse to a settlement in equity. To form an adequate judgment on the present occasion, the situation in which the appellants stood must be considered. They, in truth, were only trustees for *Lcremboure*, to be, at all events, guaranteed against any loss from undertaking the office, and, with that view, *Simond* entered into the contract. Adopting, then, these ideas, we admit that the intent ought to govern in the exposition. But in making this exposition, it ought to be recollected that the contract, now before the court, and on which the liability of the respondent arises, was of a mercantile nature. A liberal construction, such as would be given to a will, is that which, it is presumed, it would be proper to adopt. The doctrine, then, of conditions precedent, must necessarily be exploded; nor, indeed, could it ever apply, except by overlooking the distinction between those conditions which lie in compensation, and those which do not. Viewing, then, this as a commercial transaction, in which the appellants became trustees, on consideration of being kept harmless, it follows, that, if their conduct has been *bona fide*, they are entitled to the indemnity, on the faith of which they undertook the trust. The very essence of it was reimbursement for the notes they gave, or the bills they might draw. Any deficiency, however arising, was, if they were not in fault, to be made good. Suppose the property had been consumed by fire, in ware-houses, at *Hamburgh*, must the appellants have borne the loss? Yet,

to this, and a hundred other equally gross results, would the reasoning on conditions precedent necessarily lead. It is a mistake to say, that *Buildemaker &* *Co.* were the exclusive agents of the *Ludlows.* They were equally agents of the *cestui que trust*, being nominated, or assented to by all parties, for the purpose of carrying the contract into effect. But allowing the arguments against us, on this point, to be correct, who ever heard that a trustee was liable for the conduct of an agent, appointed *bona fide*, and within the limits of his authority? We deny, however, that these agents have been guilty of any misbehaviour. It is within the scope of an agent's power to change the place of sale. He is not bound to sell on the spot where the goods are consigned to him. He may transmit them to another market, and all that is required, in the exercise of this discretion, is, that it should not be at an unreasonable distance. In the present instance it was rightly done. There was no price to be obtained at *Hamburgh.* The recent failures, though they left a market, gave no *price;* for, between a market and a price, there is a wide difference. The former signifies a possibility of sale. The latter such a one as is adequate and beneficial. Sending to *Rotterdam* obtained a price, and *that* was a sufficient reason for the measure. No *mala fides* can be imputed. The contrary appears. Had any existed, a sale at *Hamburgh* to themselves, or friendly purchasers, would have enabled *Buildemaker & Co.* to avail themselves of the *Rotterdam* price for their own benefit. The counsel opposed to us, are not aware of the consequences which a denial of this discretion might induce. Suppose at *Rotterdam* a profit of 50,000 dollars; would *Buildemaker & Co.* have been

entitled to retain it? Yet, on the argument of an indispensable obligation to sell at *Hamburgh*, the proceeds at *Rotterdam* ought to be theirs. For, if liable to make good a loss resulting from such sale, the profit must belong to them. The fact is, that *Hamburgh* was the contemplated, but not the stipulated, port. If, then, the place of sale was not restricted, still less so was the time. Nothing but inference can be used to establish such a position, and a surety is not, with all the leaning of courts in his favour, to be discharged from the letter of his contract by mere implication. If his responsibilities are not to be increased, his exemptions are not to be multiplied. But the words of the instrument, and its positive provisions, show an expectation of a possible lapse of time in winding up the adventure, far beyond that allowed by the opposite side. It is expressly agreed, that the appellants shall have interest on their advances. Now interest never runs till after the day of payment. On the other points we think enough has been shown in the opening, to warrant the reversal of the decree appealed from.

SPENCER, J. In the discussion of this cause the counsel have rested their arguments on two principal points.

1st. Whether the court of chancery had jurisdiction of this cause?

2d. Whether the respondent, *Simond*, has, from the facts proved, been discharged from his responsibility on the contract entered into between the appellants, *Leremboure*, and himself?

I shall not enter into a particular consideration of the first question, because, it is immaterial, in the view I have taken of the subject, whether the court

of chancery had, or had not jurisdiction. I wish, however, to be explicitly understood as not subscribing to the proposition, that *that* court had cognizance of the cause on any of the grounds urged by the appellants' counsel; and did it rest solely on that point, the strong inclination of my opinion is, that the appellants' relief, if any they are entitled to, is at law.

ALBANY, February, 1805.

D. & G. Ludlow v. Simond.

It cannot be controverted, but that *Simond* is a surety, or guarantee for the performance of *Leremboure*'s contract, so far forth as respects the indorsement of a note which the latter stipulated to give *Daniel Ludlow & Co.* for the deficiency of the proceeds of the sales of the goods mentioned in the contract. He is a surety merely, without the chance of reaping any benefit from the enterprise; he has no interest in the adventure, and does not appear to have been indemnified by any security for this gratuitous undertaking, and although it was suggested, that he might have been interested or secured, yet no facts appear in the case, to warrant those suggestions, and the court are to judge *secundum allegata et probata.* I proceed, therefore, on the fact, that *Simond* was a surety, without any interest in the subject matter of the contract, and without any counter security.

It has been correctly urged, that sureties are favourites of courts of equity, and that those courts will not bind them, where they are not strictly bound at law. It may, in the same sense, be said, that they are favourites of courts of law; and that there they will not be bound beyond the scope of their engagements. These maxims, if I may so call them, grow out of the consideration, that in the various transactions of life, men are liable to be called on to render

acts of neighbourly kindness, without any interest or expectation of reward; that they are frequently called on to become bail, indorsors of notes, guarantees in various modes, and when, in such cases, the principal turns out to be insolvent, it becomes a question, which of two innocent parties shall sustain a loss. Both courts of equity and law will cast the responsibility on the surety, if, by the *terms* of his engagement, he has assumed it; but neither of them will do this where he is not brought within the precise scope of his undertaking.

The authorities on this subject are very uniform; they speak a language not to be misunderstood, and, without detaining the court by an enumeration of them, I am fully justified, by those cited, in saying, that, both in law and equity, contracts, involving the rights of sureties, will, so far as respects *them*, receive a more rigid and less liberal construction, than between the original contracting parties.

I shall not unnecessarily repeat the facts in this cause. The material ones are, that by the contract, subscribed by the respondent, it was stipulated, that *Leremboure* should put on board one or more vessels, tobacco and sugars at certain fixed prices, of the value of 40,000 dollars. That these goods should be consigned, under bills of lading, to *Buildemaker & Co.* the appellants' correspondents at *Hamburgh*, to be sold for the account and risk of *Leremboure*; that he should insure them, and assign the policies to the appellants, who should receive from the underwriters the amount of the losses to reimburse themselves, the appellants stipulating to furnish their notes to *Leremboure* for the 40,000 dollars, payable, the one-half

at four months, the other half at six months, and if
the proceeds of the shipments should exceed the
amount due the appellants, they were to be answera-
ble to *Leremboure* for the difference when in cash.

If the policies did not furnish a mode of reim-
bursement, then the appellants were authorised to
draw at sixty days sight on *London*, twenty days be-
fore their notes respectively became due, at the then
current exchange, and to order the necessary remit-
tances to be made by *Buildemaker & Co.* at the risk
of *Leremboure*, both as to the validity of the bills,
and the solvency of the house in *London*, to whom
the same should be made, and should the proceeds of
the sales at *Hamburgh*, so disposed of, not prove suf-
ficient to reimburse the appellants the amount of their
several notes, together with what interest might be
due them on their advances, their commissions, and
all other charges attending the negotiation, *Lerem-
boure* agreed to make good the deficiency, as soon as
ascertained, by giving his note to the appellants paya-
ble at 60 days, *to be indorsed by the respondent, who
agreed thereto.*

The shipments were made on the 11th of *March*,
and the 6th of *April*, 1799, at which time the appel-
lants gave their notes stipulated to be given by the
contract. The cargoes shipped and consigned to
*Buildemaker & Co.* arrived safe in the summer of
that year; previous to the arrival of the cargoes, a
great change had taken place in the market at *Ham-
burgh*, and many failures had happened among the
principal traders there. *Buildemaker & Co.* without
any directions from the appellants, sent 219 hogs-
heads of tobacco to *Rotterdam*, where they were sold

in *December*, 1799, and the summer of 1800, in the name of the appellants. The proceeds of the sales were insufficient to reimburse the appellants, the amount of their notes, with interest, commissions and ·charges, and for that deficiency the suit below was instituted against *Leremboure* and the respondent. It appears that, after the accounts had been received from *Buildemaker & Co.* the appellants presented them to *Leremboure*, who overlooked them, and said they were right, but that, having become insolvent, and being then confined for debt, he refused to give his note for the deficiency, and both he and the respondent refused, after the time had elapsed when such note, if given, would have become payable, to pay the appellants the balance, which the appellants claim to be 24,044 dollars 82 cents.

The only proof of the price of tobacco at *Hamburgh*, is derived from the deposition of *John H. Schmidt*, who states, that the price of *Virginia* tobacco there, from the month of *October*, 1799, to the latter end of the year, was, from three and nine-pence to four shillings a pound, *Hamburgh* currency ; but that he does not know the price in the summer of that year, although *Maryland* tobacco was considerably higher than *Virginia*, during that period. It would seem that the sending the tobacco to *Rotterdam* has saved those interested in the proceeds from 3 to 6,000 dollars, if the price at *Hamburgh*, in the summer of 1799, was not higher than in the fall of that year, and the year ensuing. ·

There is no proof in the cause, that, on account of the failures at *Hamburgh*, the tobacco was unsalea-

ALBANY,
February, 1805.

D. & G. Ludlow
v.
Simond.

ble ; on the contrary, it appears that the sugars were sold, and that in *October*, 1799, tobacco was sale-able.

From this state of facts arises the question, whether the respondent is to be holden responsible for the deficiency of the sales ? and, in my opinion, he is not responsible. The contract he has entered into, obliges him to indorse *Leremboure's* note for the deficiency of the proceeds of the sales at *Hamburgh*. The place of the sales is, in my conception, not only a condition precedent, but it enters into the substance of the contract. It may not appear, at first view, at all material where the sales were made, provided the goods were sold for the best price that could be obtained ; but it will, on examination, appear extremely important to the respondent, that the sales should have been made at *Hamburgh*, rather than *Rotterdam*. Whether, however, this be, or be not material, if *Hamburgh* was agreed by the contract to be the place of sale, then on principles, as applicable to sureties, the respondent is discharged.

That *Hamburgh* was the designated place of sale is manifest, not only from the words of the contract, but from its plain and evident meaning. The goods were consigned to *Buildemaker & Co.* to be sold ; the consignment to this house, transacting business at *Hamburgh*, a great commercial city, imports, in itself, that the sales were to be there. The insurances extending no further than to *Hamburgh*, is still more demonstrative of the sense and understanding of the parties, that they were to go no further. The want of provision in the contract for any other market, and, above all, the express terms of the contract, whereby

E

the respondent engaged to indorse *Leremboure's* note for the deficiency of the proceeds of the sales at *Hamburgh*, leave, I think, not a particle of doubt on that subject.

This case is, then, perfectly analogous to the case in 2 *Chan. Ca.* 22, where a bond was given by a principal and his surety, to pay such sum as *N. H.* a master in chancery, should report. The master agreed on, died without making a report. The chancellor determined on the principle I have stated, that the surety, not being bound at law, should not be holden in equity.

The sales not having been made at *Hamburgh*, is, I think, matter of substance. I have observed already, that the appellants gave their notes on the 11th of *March*, and 6th of *April*, 1799. The first became payable the 14th of *July*, and the last the 9th of *October*, in that year. The appellants contemplated, beyond a doubt, to meet these notes by drafts on *London*, at sixty days sight, and for that purpose *Leremboure* authorised them to draw bills, twenty days before their notes respectively became due, and to order the necessary remittances to be made by *Buildemaker & Co.* to their friends in *London*, on whom they might value to meet their drafts. From this arrangement the respondent must have contemplated, when he entered into the contract, that the cargoes thus shipped were to be sold, so as to form a fund for the payment of the bills to be drawn by the appellants, and that the term of his responsibility would not be extended beyond the last of the year 1799. Instead of this, by the transportation of the goods to *Rotterdam*, the period of his responsibility was enlarged to

the 30th of *September*, 1800, a time far beyond any ideas he could have formed from the provisions of the contract. Had it not been thus enlarged, and the goods been sold for the lowest possible price at *Hamburgh*, he might, for aught that appears, have secured himself before *Leremboure* became insolvent. As in the case of *Rees* v. *Berrington*, 2 *Ves. J.* 543, so here, in the language of Lord *Loughborough*, " we cannot try the cause by inquiring what mischief it may have done *(to send the goods to Rotterdam)* for that would go into a variety of speculation, upon which no sound principle could be built."

ALBANY,
February, 1805.

D. & G. Ludlow
v.
Simond.

To hold the respondent liable, notwithstanding the terms have not been complied with, on which alone his responsibility was to arise, would be substituting another contract in lieu of the one the parties have made. It is impossible to say, that a contract, agreeing to be responsible for the deficiency of the proceeds of sales at *Hamburgh*, ought to be construed to be a contract to be responsible for the deficiency of the proceeds of sales at *Rotterdam*.

It has been urged by the appellants' counsel, that *Buildemaker & Co.* were not exclusively their agents, and that they acted without their directions, in sending the goods to *Rotterdam*, and that they had, by law, a right to send them to a neighbouring market for a better price.

It will not, I trust, be contended, that had the appellants ordered the goods to *Rotterdam*, in case a higher price could have been there obtained, that, then, the respondent would have been liable. If, in that case, all responsibility would have been gone, how can it alter the case, as respects the respondent,

by what means the goods were sent there? He had no controul over them ; and if his responsibility is extended beyond the terms of his contract, however hard the case may be as regards the appellants, it would be harder as respects him. If, by law, an agent receiving a consignment of goods to sell, may send them to another market, which I am not prepared to admit, then the appellants may be chargeable with negligence in not instructing *Buildemaker & Co.* to sell at *Hamburgh*. But if, as I incline to think, they could not, as consignees, have sent their goods to another market, they would, under the facts proved in this case, be responsible to the appellants, unless they have affirmed their acts, and thus concluded themselves. "A man may," says Chief Justice *Willes*, in his reports, p.407, "in many cases, either consider another as a wrong-doer, or as a receiver of money for his use, as he thinks best, and most for his advantage." In this case, the appellants have, it appears to me, affirmed the acts of *Buildemaker & Co.* in selling the goods at *Rotterdam*, by receiving their accounts, and passing the proceeds of the sales there, to the credit of *Leremboure*. This fact appears by the accounts exhibited by the appellants. It then turns out to have been a sale at *Rotterdam*, contrary to the contract, assented to by matter *ex post facto* by the appellants, and this I consider another insuperable difficulty to their recovery.

The amount in demand, and the learned and ingenious arguments submitted to the court, have induced all the research and examination in my power to bestow. The clear and decided result is, that the respondent is discharged from his responsibility on the

contract; and, although I perceive that the appellants have conducted themselves with perfect good faith; that the loss is, to them, a severe misfortune, I am unwilling to restore them their losses, by inflicting an injury on a man having a perfectly legal and meritorious defence. In my opinion, therefore, the decree of the chancellor must be affirmed with costs to be taxed.

THOMPSON, J. This case naturally divides itself into two general subjects of inquiry. 1st. As it respects the remedy, whether, if any, it ought to be in a court of law, or in a court of equity ? 2d. As it respects the rights of the parties.

The first may be considered, in some measure, as matter of form; the second as matter of substance; and although it might be deemed more correct, in point of order, to determine the right before the remedy, yet, as I shall examine both questions, not knowing the course that may be pursued by other members of the court, the order of examination becomes immaterial.

There are several grounds, I think, upon which the appellants had a right to go into equity for relief.

It is undoubtedly important to the ends of justice, that the boundary between the jurisdiction of courts of law, and courts of equity, should be plainly marked, and strictly pursued. Were, indeed, the present an attempt to overleap the boundaries heretofore established, it might present a different question; but that, I think, is not the case here. By the ancient rule, according to Lord *Coke*, 4 *Inst.* 84, the jurisdiction of the court of chancery, was confined to frauds, accidents and trusts. So in 10 *Mod. Rep.* 1.

But that jurisdiction has been gradually extend-
ed, and *Fonblanque*, in the first volume, page 8, of
his valuable treatise, observes, that the *English*
courts of law are, equally with their courts of equity,
chargeable with having extended their jurisdiction
by the aid of fiction ; and that if courts of equity,
professing to proceed upon the ground of the party
being remediless at law, do take cognizance of some
matters, of which courts of law would now take cog-
nizance, they will be found originally to have derived
their jurisdiction from the narrow decisions of courts
of law, and having once strictly possessed it, courts
of law ought not to be at liberty at pleasure to deprive
them of it. The jurisdiction, he again says, page 11,
exercised by courts of equity may be considered, in
some cases, as assistant to, in some, concurrent with,
and in others, exclusive of, the jurisdiction of courts
of common law.

Matters of account form one class of cases, where-
in courts of law and equity, exercise concurrent juris-
diction. *Blackstone*, 3 *Com.* 437, lays it down as
extending to *all* matters of account ; and it is a sub-
ject, I think, over which the jurisdiction of a court
of equity ought to receive a liberal construction, be-
cause, the mode of proceeding is more peculiarly
adapted to a deliberate examination, and correct set-
tlement. All parties in the present case, were inte-
rested in having the account stated. The result was
the basis, upon which the respective rights, and re-
sponsibilities of the parties depended. The account
being to be stated by the appellants themselves, can-
not alter the question. The other party had a right
to contest it, and the same examination might be in-

ALBANY.
February, 1805.

D. & G. Ludlow
v.
Simond.

volved as if the defendants below had been called up-on to account. In matters of account both parties are actors. 1 *P. W.* 363. Hence it is, that after a decree to account, a defendant may revive the suit ; because, say the authorities, in such case the defendant is considered as an actor ; for, until the account is taken, it is not known where the balance lies. Although the account, as stated, was admitted by *Leremboure*, it was not by *Simond.*

The necessity of a discovery might originally have been the foundation of the jurisdiction of a court of chancery, in matters of account ; still I cannot discover from authorities that it is now restricted to cases of that description. *Mitford*, 111, says, that in matters of account, equity has a concurrent jurisdiction with courts of common law, in cases where no difficulty would have attended the proceeding in those courts. *S. P.* 1 *P. Will.* 251. *n.* A. And I can see no good reason why a trustee, who is desirous of having his accounts settled, should not be at liberty to call the *cestui que trust* into a court of equity for that purpose.

There is another ground, I think, for sustaining the bill. *Leremboure* had refused to give his note for the deficiency, and it may be *doubtful*, whether a specific performance in this respect, was not necessary for the purpose of charging *Simond.* If also, any fraud or collusion had been practised between them, it would, in a peculiar manner, be an object of chancery jurisdiction.

The transaction was complex, the remedy at law, difficult. 1 *Stra.* 733. Mr. Justice *Buller*, when sitting for the Lord *Chancellor*, in the case of *Wey-*

*mouth* v. *Boyer*, 1 *Ves. J.* 424, says, " we have the authority of Lord *Hardwicke*, that if a case be doubtful, or the remedy at law difficult, he would not pronounce against the jurisdiction of this court, and the same principle has been laid down by Lord *Bathurst*." Matters of account are proper subjects for a court of equity. 1 *Atk.* 128. It does not follow, that because a court of law would give relief, that a court of equity loses the concurrent jurisdiction, which it has in matters properly cognizable there. 3 *Bro. Ch. Ca.* 224. In *Wright* v. *Hunter*, 5 *Ves. J.* 794, the master of the rolls says, " I would not lay it down, that because courts of law may entertain actions upon such subjects" (a case of contribution among partners) " a party may not file a bill for contribution ;" for though he thought the question more proper to be tried at law, the plaintiff was very well justified in coming there, " for," he adds, " this court has never given up its jurisdiction."

Independent, however, of the foregoing considerations, I am inclined to think, the respondent comes too late with an objection to the jurisdiction of the court, he having answered, and contested the merits, the subject matter of the bill being within the jurisdiction of the court. This appears to me, to be a reasonable rule, and calculated to save expenses. It is a good general principle, that where a party objects to the jurisdiction of a court, he ought to do it at the earliest opportunity. I would not, however, be understood to extend this rule, to cases where the subject matter is not within the jurisdiction of the court. Baron *Gilbert*, in his history and practice of the court of chancery says, page 219, " where the common law

would give the same relief as a court of equity, there,
if the defendant would deny the deed, and demur to
the relief, the demurrer would be allowed ; but if
the defendant doth not demur to the relief, the court
will decree for the plaintiff on the hearing, after the
deed is properly proved ; because the defendant ad-
mitted the jurisdiction by answering and putting it
in issue, and not demurring." Again, page 51,
where a plaintiff goes into a court of equity, for
damages, which are uncertain and not to be settled
but by a jury, the defendant may demur to the re-
lief after having first answered to the damages ; be-
cause it is *alieni fori*, since the court cannot settle the
damages." But this must be *ante litis contestationem;*
for if he answers and contests with the plaintiff, he
can take no advantage of it at the hearing ; for he
has submitted to the jurisdiction of the court, and
the court will not try at law the *quantum* of damages
by a feigned action, 1 *Vez.* 446. I am therefore of
opinion, that the objection to the jurisdiction of the
court was not well founded.

But as the result of my opinion is with the respon-
dent, it is of little moment, as it respects the present
case, whether the appellants have resorted to the
proper *forum* for redress or not.

The first question presented, on this part of the
case, relates to the *execution* of the contract, on the
part of the appellants. It purports to have been
executed in the name of *Daniel Ludlow & Co.*
being the name of a firm, composed of *Daniel &*
*Gulian Ludlow.* The signature must necessarily
have been written by one only of the company, and as
it is a settled rule of law, that one partner cannot

F

ALBANY,
February,1805.

D. & G.Ludlow
v
Simond.

bind his copartner by seal, it is contended that the contract is invalid. Had the execution been by one of the firm, without the assent of the other, the objection might be well grounded; but from the testimony, the fact appears otherwise. Two witnesses testify, that they saw *Daniel Ludlow* and *Gulian Ludlow*, execute the contract. It is said, however, that this testimony is equivocal; that the witnesses intended probably to be understood, that they executed it in the usual and ordinary mode, in the course of the partnership concerns, by one only of the company. This inference appears to me, not warranted by the language of the witnesses. They speak of the parties individually, not as a company; and had not *Daniel Ludlow* and *Gulian Ludlow* both been present, and assented to the execution, the language of the witnesses, doubtless would have been, that they saw the contract executed by the one, who subscribed the name of the company. The interrogatory part to the witnesses was, " did you or not, see *Daniel Ludlow* and *Gulian Ludlow* execute the deed?" Taking it for granted, from the evidence, that *Daniel* and *Gulian* were both present, and assented to the execution, and probably both acknowledged the seal, I think the contract well executed, according to the principles settled in Lord *Lovelace's Case*, Sir *W. Jones*, 268, and *Ball* v. *Dunsterville*, 4 *D. & E.* 314.

I shall next examine the character which the respondent, *Simond*, assumes in this contract. This becomes necessary; because, from the whole current of authorities, it is manifest, that where a party is charged as surety, he has a right to avail himself of a strict

and literal construction of his contract, in order to exonerate himself from responsibility.

In examining this question, we have principally to resort to the contract itself. In expounding it, the cardinal rule is, that the intention of the parties ought to be sought after, and carried into effect, and to govern the construction, where, from the instrument itself, that intention can be discovered. In viewing the general nature and object of this contract, and the parties who were to be beneficially interested in the speculation, I can consider *Simond* in no other point of light, than in the character of a mere surety. It is the essence of a partnership transaction, that each partner should be entitled to the gain, as well as exposed to the loss resulting from the concern. That was not the case here, for it is expressly provided, that if the proceeds of the several shipments, shall exceed the amount due *Daniel Ludlow & Co.* it shall be paid to *Leremboure*. Every feature of the contract shows, that *Simond* was not concerned in interest. The shipments were to be made by *Leremboure*. The notes to purchase the cargoes were to be furnished to them. The sales were to be made on his account, and at his risk. The policies of insurance were in his name, and by him to be assigned. The loss, if any, at the winding up of the speculation, to be borne by him ; for the contract expressly states, that " *A. M. Leremboure* agrees to to make good the deficiency when ascertained." The mode of doing it, however, was by giving his note, with *Simond's* indorsement. The appellants, in their bill, pray, " that the accounts between them, " and the said *Leremboure*, arising under the said

agreement, may be taken and stated." Not that the accounts between them, and the said *Leremboure* and *Simond*, might be taken and stated, which would have been the prayer, had they conceived *Simond* beneficially concerned. In addition to this, *Simond*, in his answer, under oath, solemnly denies having any interest in the contract, and this is not contradicted, or in any manner rebutted, by the appellants.

*Simond*, then, being considered a mere surety, it becomes necessary, in order to determine his liability, further to examine the contract, and see what was to be done by the parties respectively, for the purpose of determining, how far each one has complied with his obligation imposed by the contract, and the law applicable to this case. There is no necessity, however, of minutely examining all the stipulations, contained in the agreement; no breach of them is alleged on either side. *Leremboure*, on his part, purchased and shipped the cargoes pursuant to his contract; caused them to be insured, and duly assigned the policies to the *Ludlows*. The *Ludlows*, on their part, furnished *Leremboure* with the means of purchasing these cargoes, and consigned the bills of lading, which were given to them, to *Buildemaker & Co.* their correspondents at *Hamburgh*, according to the stipulations of the said agreement. But the principal controversy relates to the time and place of selling these shipments; and whether, in that respect, there has been any *laches*, on the part of the appellants, so as to take away their right of calling on the surety to make good the loss. Here I would premise, as it was made a topic of argument by the counsel, that I see no ground for alleging fraud or

collusion, either against the complainants, or the re-
spondent. But the case presents an honest struggle,
to shift the burthen of a very heavy loss.

There is no time expressly limited by the con-
tract, within which the shipments were to be dispos-
ed of; but from the other provisions in the agree-
ment, I think the intention of the parties in that re-
spect, may easily be discovered. It is fairly to be
presumed, that the complainants did not intend to
advance cash, for the purchase of these cargoes; but
only to lend their names and credit to *Leremboure*,
for that purpose. The first shipment was made on
the 11th of *March*, 1799. The notes furnished by the
complainants of that date, payable in six months, ac-
cording to the contract, would fall due the 14th of *Sep-
tember*, and those payable in four months, would fall
due the 14th of *July*. The second shipment was on
the sixth of *April*, 1799. The notes furnished of
that date, payable in four months, would fall due the
9th of *August*. The amount of the complainants
notes, furnished to *Leremboure*, was 36,431 dollars 88
cents, which fell due in the proportion, and at the
times following, to wit: 2,697 dollars 99 cents, on the
14th of *July*; 13,733 dollars 89 cents, on the 9th of
*August*, and 20,000 dollars on the 14th of *September*.
According to the usual course of a voyage, between
*New-York* and *Hamburgh*, calculating on a ready
market, the proceeds of these shipments would have
been received in season to answer the complainants
engagements. This is fortified by the appellants' own
showing, in the account current annexed to their bill
of complaint. From that it appears, that they must,
as early at least as the 16th of *July*, have received
the certificate of the sugar's having been landed at

*Hamburgh,* which was necessary to entitle them to the drawback. The sugar was shipped on the 6th of *April;* from that to the 16th of *July,* is but little more than three months. The appellants' notes were payable at 4 and 6 months, making an allowance for unforeseen delay. Hence I think it reasonable to conclude, that the appellants calculated to meet the payment of their notes, with the proceeds of these shipments, and that *Simond,* the surety, probably made the same calculation. In case *Daniel Ludlow & Co.* should not be reimbursed by the policies of insurance, they were authorised to draw for that purpose at sixty days sight on *London,* twenty days before their notes respectively became due. According to these *data,* the last draft might have been made on the 24th of *August;* the answer to which, making very liberal allowances, would, probably, have been received here as early as *December,* at which time *Simond* had a right to calculate that the speculation would have been wound up, and the result of his responsibility known.

The contract, I think, carries stronger internal evidence with respect to the place, than with respect to the time of sale. There can be but little doubt, but that the contemplated place of sale was at *Hamburgh.* The appellants stipulate to make the consignment to their correspondent at *Hamburgh.* That part of the contract providing for the deficiency, declares, that " should the proceeds of the sale at *Hamburgh,* not prove sufficient," &c. The vessel sailed for *Hamburgh,* and the insurance was for the same place. The last is a strong circumstance, showing the understanding of the parties, with respect to the place ; because, the policies were to be assigned to the appel-

lants as security, which would altogether have failed, had a loss happened after the vessel left *Hamburgh*, on a voyage to another market.

Another question for examination is, the relation in which *Buildemaker & Co.* must be considered as standing to the respective parties.

The object of the appellants manifestly was, to have the disposition of these shipments, and the proceeds completely under their controul and management.— They themselves might be considered as trustees for *Leremboure*, with a *lien* upon the property, for their advances and commissions. It would not, however, have been in the power of *Leremboure* to have called the property out of their hands, or counteracted their orders, until such *lien* had been discharged. There is nothing in the transaction showing that *Buildemaker & Co.* knew any other persons than the appellants, were interested in the shipments. The bills of lading were in their names. The consignment made by them. They to order with respect to the remittances; and, in short, to have the uncontrouled direction for the purpose of reimbursing themselves. Under such circumstances, I can conceive *Buildemaker & Co.* in no other light than as the immediate agents of the appellants. It would be incongruous to consider them the agents of *Leremboure*, and still he to have had no controul over them ; and to have permitted him to have had any controul, might have defeated the *Ludlows'* security in some measure. But admitting *Buildemaker & Co.* to have been the joint agents of the appellants and *Leremboure*, it cannot affect the rights of *Simond*. His liability could not be prolonged or increased without his assent.

ALBANY,
February, 1805.

D. & G. Ludlow
v.
Simond.

In what respects, then, has there been a variance in the execution of this contract, from what may reasonably be supposed to have been the understanding and intention of the parties? I think there has been a deviation both with respect to time and place. The final winding-up of the speculation has been prolonged from some time in *December,* 1799, to *September,* 1800; and the sales of the tobacco were at *Rotterdam* instead of *Hamburgh.* The appellants having the controul over this property, in the characters of trustees for *Leremboure,* it was their duty to have made use of more diligence in the disposition of it; or if, from a change of circumstances at *Hamburgh,* any embarrassments were thrown in the way, *Leremboure,* and his surety, ought to have been apprised of it. The forbearance of a trustee, in not doing what it was his office to have done, shall, in no sort, prejudice the *cestui que trust,* since, at that rate, it would be in the power of trustees, either by not doing, or by delaying to do their duty, to affect the rights of other persons. 3 *P. Will.* 215.* It is not reasonable to suppose the appellants were ignorant of the conduct of *Buildemaker & Co.* in sending the tobacco to *Rotterdam.* They had not been reimbursed for their advances; the proceeds of the tobacco, as well as the sugar were to make the fund to which they were, in the first instance, to look for reimbursement. In addition to this, the account current, annexed to the appellants' bill, shows, I think conclusively, that they must have been apprised of it. They continue drawing, at different times, on *Buildemaker & Co.* until the 13th of *August,* 1799. They then stop, and no further draft is made until *Septem-*

* *Lechmere v. Earl of Carlisle.*

*ber*, 1800. Why this delay? They were not reim-

buised; they must have known the fund, first to be resorted to for that purpose, was not exhausted, or they would have called on *Leremboure* and *Simond* for the deficiency. They wait, however, for one whole year, and then draw upon *Buildemaker & Co.* for the proceeds of the tobacco. By this, I think, they affirm the conduct of *Buildemaker & Co.* in sending the tobacco to *Rotterdam*, if it was unauthorised in the first instance. *Willes,* 407. It is unnecessary here to say, what ought to be the decision as between *Ludlows* and *Buildemaker & Co.* or between *Ludlows* and *Leremboure.* It appears to me, however, to be allowing agents a very considerable latitude of discretion to justify so material an alteration of the destination of a cargo, as from *Hamburgh* to *Rotterdam;* from a neutral, to a belligerent port. Yet, where agents act in good faith, a very liberal construction ought to be given to their conduct. Very different rules prevail when the rights of sureties are involved; as against a surety the contract cannot be carried beyond the strict letter of it. 2 *D. & E.* 370. A party cannot oblige a surety to remain such, contrary to his consent, longer than the time first bargained for. 2 *Bro. Ch. Rep.* 582, 3. Delay granted to the principal will discharge the surety. 2 *Ves. J.* 542. The engagement of *Simond* was definite, to wit, to indorse *Leremboure's* note for the deficiency of the proceeds of the shipments to reimburse *Ludlows.* This deficiency, however, to be ascertained, in the manner and within the time prescribed by the contract. This *Simond* had a right to demand. In the case of *Wright* v. *Russel,* 3 *Wils.* 359, the court

G

said, " a surety ought not to be bound beyond the scope of his engagement. That courts of equity are favourable to sureties; for, where they are not strictly bound at law, a court of equity will not bind them." This doctrine was recognized, and very much approved of, by Lord *Kenyon*, in the case of *Myers* v. *Edge*, 7 *D. & E.* 256. Where any act has been done by the obligee, that may injure the surety, equity will discharge him from his liability. 4 *Ves. J.* 833. In the present case, the appellants, by prolonging the winding-up of this contract, exposed the surety to greater hazards, among which the insolvency of *Leremboure* was no inconsiderable one, as the result has shown. The case of *Simpson and Field*, 2 *Ch. Ca.* 22, is a strong one to show the rigid construction adopted by courts to protect sureties, and also that equity will not bind them farther than they would be bound at law. The case was shortly as follows: the defendant was bound, as surety, in a recognizance conditioned to pay what should be reported by *N. H.* a master named in the condition. The master died before the report was made, and, by the strict letter of the condition, the defendant was not suable at law, because the report was not made by the master named, but by another. The Lord Chancellor dismissed the bill, saying, the party is but a surety, and not bound at law. The same principle we find recognized in the cases of *Ratcliff* v. *James*, 1 *Vern.* 196, and *Sheffield* v. *Lord Castleton*, 2 *Vern.* 393, and numerous others that might be cited.

If the view which I have taken of the contract be correct, and the deduction made be warranted by the case, the respondent stands protected by a host of authori-

ties. However honest and upright the conduct of the appellants may have been, they are chargeable with such a deviation from the contract, and such a want of due diligence in winding up the speculation, as will, in judgment of law, exonerate the surety. I am, therefore, of opinion, that the decree of the court of chancery ought to be affirmed.

KENT, Ch. J. In the discussion of this cause, two leading questions have been raised, both of which have been very elaborately and ably considered by counsel. The one question relates to the mode of seeking redress, and the other to the merits of the controversy. It is necessary that I should give each of them an examination, and this I shall do in the order in which they are stated.

The first question then is, whether the court below had jurisdiction of the cause?

I incline to the opinion, that the court had jurisdiction; 1st. Because matters of account were involved. 2d. Because the remedy, at law, was, at least, doubtful. 3d. Because the defendant, instead of demurring to the bill, submitted to the jurisdiction by putting in an answer to the merits.

The bill stated, at large, the contract between the appellants and *Leremboure* and *Simond*, and the history of the commercial adventure which arose out of that contract. It then stated, that a considerable loss happened on the sales abroad, and that the accounts, relative to the transaction, were presented to *Leremboure*, who acknowledged them to be just, but refused to give his note as stipulated by the agreement, and that both he and *Simond* refused to pay to the appellants the balance due them on the contract. The bill

ALBANY,
February.1805.

D. & G. Ludlow
v.
Simond.

further stated, that difficulties would attend their proceeding at law, and prayed that the accounts respecting the transaction might be taken and stated, and the balance paid.

These accounts embraced the whole process of the adventure, from its commencement to its conclusion, and, consequently, consisted of a variety of charges and credits. As, then, one material part of the cause depended on a settlement of accounts, I think it came properly within the cognizance of the court. Chancery has a concurrent jurisdiction with the courts of law in all matters of account. Whether this jurisdiction originally arose from the necessity of obtaining a discovery by the oath of the defendant, or, in order to prevent a multiplicity of suits, is, perhaps, not now material to inquire, since it has become well established in cases where that necessity does not exist, and where no difficulty would attend the remedy at law. *Mitf. Treatise*, 109, 110, 111. 3 *Black. Com.* 437. The cognizance of all causes that lie in account, does, undoubtedly, give a very broad jurisdiction to the court of chancery, but the exercise of this jurisdiction has been found in practice so convenient and salutary, that it has long since, by general consent, rendered obsolete the common law remedy by a writ of account; and, although our statute prescribes minutely the mode of proceeding by that writ, I doubt whether there ever was an instance of such an action having been prosecuted to effect in this state. The settlement of accounts, if they are in any degree long or complex, is improper, if not impracticable for a jury. The statute, therefore, in the writ of account, provides, that the accounts shall be

submitted to auditors; and, indeed, when questions of account arise at law, in the common action of *assumpsit*, they are pretty generally taken from a jury, and submitted by the court to referees, which the courts are authorised to do, with or without the consent of the parties.

I know not of any rule limiting the cognizance of the court of chancery to one species of accounts more than another; or to matters of accounts against persons in any particular relation. Its jurisdiction extends to all matters of account between individuals, in whatever relation they may stand to each other. In this it has no more than a concurrent jurisdiction with the courts of law; for the writ of account at law, is given by our statute, 1 *Rev. Laws*, 94, in all cases where one person is liable to account to another as guardian, bailiff, receiver, *or otherwise*, and this renders the writ more extensive than it was under the English law.

But it was objected upon the argument, that the appellants were in the light of factors or trustees coming into court to have their own accounts stated, and allowed against their principal. This, however, they may well do. In bills to account, both parties are considered as actors, or plaintiffs, and the defendant has the same advantage as if he had himself instituted the suit. *Done's case*, 1 *P. Will.* 263. *Kent v. Kent, Prec. in Ch.* 197. A trustee may go into Chancery to have an allowance made against his *cestui que trust*, out of trust monies in his hands. Of this we have an instance in the case of *Gould v. Fleetwood*, 3 *P. Will.* 251 *n.* (A). Guardians of great estates, in England, are said to pass their accounts yearly in the court of chancery, and this is recom-

mended in *Wood's Inst.* 73, as a safe way to jus-
tify themselves, when the minor, at full age, shall call
them to a general account.

Nor is it necessary that the responsibility of the
defendant should be established before you can file a
bill for an account. In most cases that responsibility,
as well as the stating of the account, will be a point
for litigation. It is sufficient that the cause will in-
volve an account in case of the liability of the defend-
ant. Both questions must be more or less connected
together in every case; especially as to the extent of
the engagement, and how far it will apply in particu-
lar instances.

It was said, however, that there were no accounts
to state and settle in this cause, for the bill charges
that *Leremboure* had admitted the accounts to be
just. But the answer of *Leremboure* declares, he ad-
mitted them no further than as to the correctness of
the calculations; and if he had, his admissions could
not have concluded *Simond*, who would be entitled to
have the accounts reliquidated, and the deficiency
stated, before the court would oblige him to perform
his part of the contract.

For these reasons, I think the suit below was pro-
perly instituted, and I should regret exceedingly,
that any opinion which might be given by this court,
should tend to embarrass the benign and well settled
jurisdiction of chancery, in the unlimited cognizance
of accounts.

Another ground upon which the bill might be sus-
tainable is, that the remedy at law was, at least,
doubtful. This has been repeatedly held as sufficient
to give the court of chancery jurisdiction. *Billon* v.
*Hyde*, 1 *Atk.* 128. 1 *Vez.* 331, *Burrows* v. *Jemimo*.

2 *Stra.* 733. 1 *Ves. J.* 424.* The contract is sus-
ceptible of two constructions, upon one of which there
was clearly no remedy at law. If we take the con-
tract according to its grammatical construction, *Simond*
was bound only to indorse the note that *Leremboure*
should give for the deficiency, and the giving the note
was a condition precedent to the obligation of *Simond.*
It may be said, however, and that too with great force
of argument, that unless *Simond* was bound that.
*Leremboure* should give the note, as well as that he
should indorse it, the security intended by the con-
tract, would in a great degree vanish. If we assume
the first construction, there would be no remedy for
the appellants, without the aid of the court of chance-
ry, for a suit at law would not lie for not indorsing a
note which was never drawn. In such a case, the
assistance of chancery would become essential, to
compel the making of the note, or to reach the case
of fraud or collusion between *Leremboure* and *Si-
mond*, in not giving the note. The uncertainty,
therefore, and the difficulty of an adequate legal re-
medy, was a sufficient reason for sustaining the
bill.

It may be, also, a matter of doubt whether the con-
tract was valid in its execution, as a sealed instru-
ment or specialty. The proof indeed is, that the
witnesses saw the appellants execute the contract, and
if we are to understand them as meaning that both
the appellants were actually present, and united in
executing it, it was a good execution ; for several
persons *may* enter into an obligation and bind them-
selves by one seal. Lord *Lovelace's case, Sir W.
Jones,* 268. *Ball* v. *Dunsterville,* 4 *D. & E.* 313.—
But it may be well doubted whether the witnesses

ALBANY,
February, 1805.

D. & G. Ludlow
v.
Simond.

* *Weymouth* v.
*Boyer.*

meant any thing more than that the appellants exe-
cuted the deed, in the usual mercantile way, by one
of them doing it in the name of the firm; for the
appellants state in their bill, that they, or one of them,
executed it, and that they supposed such execution
to be unexceptionable. If the fact really was, that
only one of the appellants executed the contract, it
was not a good execution at law, and it was ne-
cessary to resort to equity, to try how far that infor-
mality in the execution might be corrected, as it was
clearly founded in mistake. *Sheffield* v. *Lord Castleton
and Wife*, 2 *Vern*, 393. Chancery would not help a
defective execution of a contract against a surety.
*Crosby* v. *Middleton*, 3 *Ch. Rep.* 53, & *Prec. Chan.*
309, *contra*, from whence, in 1 *Fonb.* 37, the point is
considered as doubtful.

But admitting these grounds not to have been suf-
ficient, in the first instance, to have sustained the bill,
the respondent came too late to object to the juris-
diction of the court, after he had put in his answer to
the merits of the cause. By answering in chief, instead
of demurring, he submitted his defence to the cogni-
zance of the court; and equity will, and ought, in such
cases, to retain the cause, provided the court be com-
petent to grant relief, and has jurisdiction of the sub-
ject matter, as it manifestly had in this case, the
controversy being upon a matter of personal contract,
and of account. *Billon* v. *Hyde*, 1 *Atk.* 128. 1 *Vez.*
331. 3 *Bro. Pa. Ca.* 525. *Mitford passim. Gilbert's
Treatise on Chan.* 51, 3. 219, 220, 1. *Penn* v. *Lord
Baltimore*, 1 *Vez.* 446, 7. This last reason why the
cause was sustainable in the court below, appears to
me, to be supported on the firmest basis, both from
the reason of the thing, and the weight of authorities.

Having thus disposed of these preliminary or technical questions, as to the jurisdiction of the court, I proceed, secondly, to examine the merits of the case.

To perceive that *Simond* had no beneficial interest in the concern, and was but a mere naked surety for the performance of a specific act, requires only a bare perusal of the contract. The formal beginning and conclusion of the contract, do, indeed, seem to carry the agreement of the parties to the whole instrument; but we must examine the body and the scope of the agreement, to judge of its meaning and effect. On doing this, we shall immediately perceive, that the agreement of each party is to have reference only to such particular parts of the contract, as apply to him ; *reddendo singula, singulis ;* and as *Simond* was only a surety, it becomes important to consider and understand well, the principles of law, which are applicable to him in that character.

It is a well settled rule, both at law, and in equity, that a surety is not to be held beyond the precise terms of his contract, and, except in certain cases of accident, mistake, or fraud, a court of equity will never lend its aid to fix a surety beyond what he is fairly bound to, at law. *Underwood* v. *Staney*, 1 *Ch. Ca.* 77. 1 *Eq. Abr.* 93. *K. pl.* 2. 6. *Skip* v. *Huey*, 3 *Atk.* 91. *Crosby* v. *Middleton, Prec. Ch.* 309, are cases where chancery has said it would fix a surety for mistake or fraud. *Wright* v. *Russel*, 3 *Wils.* 530. *Lord Arlington* v. *Merricke*, 2 *Saund.* 411. *Myers* v. *Edge*, 7 *D. & E.* 254. *Stratton* v. *Rastall*, 2 *D. & E.* 370. *Simpson* v. *Field*, 2 *Ca. Ch.* 22. *Ratcliffe* v. *Graves*, 1 *Vern.* 196. *Nisbet* v. *Smith*, 2 *Bro. Ch. Rep.* 579. *Rees* v. *Berrington*, 2 *Ves. J.* 540. *Law* v. *E. In.*

H

*Comp.* 4 *Ves. J.* 833, are all cases in favour of sureties. This rule is founded on the most cogent and salutary principles of public policy and justice. In the complicated transactions of civil life, the aid of one friend to another, in the character of surety or bail, becomes requisite at every step. Without these constant acts of mutual kindness and assistance, the course of business and commerce would be prodigiously impeded and disturbed. It becomes, then, excessively important to have the rule established, that a surety is never to be implicated, beyond his specific engagement. Calculating upon the exact extent of that engagement, and having no interest or concern in the subject matter for which he is surety, he is not to be supposed to bestow his attention to the transaction, and is only to be prepared to meet the contingency, when it shall arise, in the time and mode prescribed by his contract. The creditor has no right to increase *his* risk, without his consent; and cannot, therefore, vary the original contract, for that might vary the risk.

In the present case, the respondent agrees to indorse a note for *Leremboure ;* but that note was only to be required upon the happening of a certain event. It was not *any* note that was to be given and indorsed; but it was *a* note to arise on the deficiency of the proceeds of certain sales at *Hamburgh,* and it was to be given to complete a reimbursement, which the appellants were first to seek for, by other ways and means, precisely defined. The contract provided, with a studied minuteness, the several modes by which the appellants were to seek a reimbursement. They were first to resort to the policies of insurance,

made to cover the shipments to *Hamburgh*, and which policies were to be assigned to them. But this means could only be resorted to in case of loss on the voyage; and there was no such loss, for the goods arrived safe at the port of destination. " Should this mode of reimbursement not take place," (to use the words of the contract,) the appellants were then authorised to draw, at 60 days sight, on *London*, and that too, 20 days before their notes respectively became due, and to order the necessary remittances to be made by *Buildemaker & Co.* to meet their drafts. These drafts and orders were, of course then, all to be made and completed by the 22d of *Aug.* 1799, which would be 20 days before the last of the notes became due ; and, allowing the ordinary passage to *London*, the payment of the last bills there, would have been to be made by the 1st of *December*, 1799. This was the second mode of reimbursement, provided for by the contract. But should the proceeds of the sales at *Hamburgh*, " so disposed of," to again adopt the terms of the contract, not prove sufficient to reimburse the appellants, *Leremboure* was to make good the deficiency, as soon as ascertained, by a note, at 60 days, to be indorsed by *Simond*. This was the last and final mode of reimbursement, and upon which the present controversy has arisen. The returns from *London*, of the result of the proceeds of the sales at *Hamburgh*, " so disposed of," would have arrived at *New-York*, in the ordinary course of transmission, by the middle of *January*, 1800, and this was the ultimate time which resulted from the terms of the contract, for the completion of the speculation, and which was to determine the extent of the responsibility of *Simond.* The calculation, as to the time when *Si-*

*mond* was to be ultimately called upon, is to be deduced from the contract, with almost as much precision and certainty, as if the contract had expressly fixed it at *January*, 1800.

The property in question, was intended to answer the bills on *London*, and reimburse the appellants. The remittances, therefore, were to be made from *Hamburgh*, by a certain time, because they were to meet a precise object. Both the appellants and *Leremboure*, must have contemplated the sales at *Hamburgh*, to be made in the summer of 1799, in order to guard against the immense loss in damages that might result, if the remittances were not met in *London*, by the 1st of *December*, 1799, to save the bills from being protested.

The place of sale was clearly designated by the contract. The property was to be consigned to *Buildemaker & Co.* at *Hamburgh*, to be sold. The property was insured for *Hamburgh*. The appellants to order the remittances to be made by *Buildemaker & Co.* to *London*, and these orders were all to be issued by the 22d of *August*, 1799. The remittances were to be made at the risk of *Leremboure*, and the contract further adds, that, should the proceeds of the sales *at Hamburgh* be insufficient, &c. There was no cover provided for risk in transmitting the property to any other place. The ultimate hazard was to terminate there. From all these facts and circumstances, I consider the intent of the contract to be unequivocal and certain, that the property was to be disposed of at *Hamburgh*. A place of sale *intended* by a contract, is equivalent to a place of sale *stipulated* by a contract. What, indeed, are stipulations in

agreements, if they are not acts intended and con-
templated by the parties?

This being the contract, let us next see with what precision it was executed. Instead of winding up the speculation, and ascertaining the deficiency, in *January*, 1800, it was not done till *October*, 1800; and instead of having the tobacco sold at *Hamburgh*, in the summer of 1799, by *Buildemaker & Co.* it was sent over land, a distance of near 250 miles, to *Rotterdam*; most of it not sold till *July*, 1800, and that too by a different house, *Roquette Buildemaker & Co.* What reasons are given for this wide departure from the terms of the contract? It is stated and admitted, that, previous to the arrival of the cargoes at *Hamburgh*, and which must have been early in *June*, 1799, many failures had happened among the principal traders there, but the effect that this calamity had upon the market or the price, is not ascertained, and we are left altogether to conjecture.—— There is no testimony as to the price of tobacco there, during the summer. It is only proven, that from the month of *October*, to the end of the year, the price of *Virginia* tobacco was from 3*s.* 4*d.* to 4*s.* *Hamburgh* currency, *per lb.* and so continued in 1800; while, for the same period, the price of *Maryland* tobacco was considerably higher. I am willing to admit, that *Buildemaker & Co.* might have sent the goods to a different market in cases of necessity; such as those resulting from fire, pestilence, or the invasion of an enemy. But this necessity must be clearly made out, and a strong case shown to justify a factor in changing the place of sale, and the agents who are to conduct it. He, by this, exposes the property to unfore-

seen accidents, and, perhaps, disconcerts all the ar-
rangements. of his principal. No sufficient cause ap-
pears, in the present case, for the conduct of the
agents. Notwithstanding these mercantile failures,
there was no complaint of a want of market or price,
as to the sugars; and it ought not to have been left to
inference only, but it should have been made affirma-
tively to appear, that the tobacco could not have been
sold during the summer of 1799. If to seek a bet-
ter market was discreet, was it requisite to go as far
as *Rotterdam*, and pass by many large commercial
neutral sea-ports and cities, that were much nearer?
But this was not all. The property was changed
from a neutral to a belligerent port, at the very time
too, when *Holland* was perishing under the rapacity of
*French* armies, and the scourge of the *Russian* and
*British* invasion. This was exposing the property to
a new, extraordinary, and, in my opinion, a most un-
warrantable hazard. In addition to the usual perils
of a long transportation, and new agents, it was ex-
posing it to the very extremity of war-risks.

Admitting, which I am willing to do, that *Builde-
maker & Co.* acted with good faith in this transaction,
and that the appellants never gave any directions as
to the change of the place of sale; have not the lat-
ter done what, in judgment of law, is equivalent.
thereto? It was a point very much litigated upon
the argument, whether *Buildemaker & Co.* were the
exclusive agents of the appellants, or only the con-
current agents of them and *Leremboure*. It does not
appear to me, to be very material to determine this
question, either one way or the other; for, it is suffi-
cient they were not the agents of *Simond*. He had

no agency or beneficial concern in the shipment, and no agreement, even between the appellants and *Leremboure*, to send the property to *Rotterdam*, could have bound him. The contract, as to him, could not have been varied without his consent. But, I think, it results from the case, that the appellants have made the act of *Buildemaker & Co.* their own. They were to draw bills on *London*, in the summer of 1799, and to order the proceeds of the *Hamburgh* sales to be remitted there. In this mode, and at this time, they were to seek a reimbursement, and it appears, from the account annexed to the bill, that, during *that* summer, they drew on their agents for 30,777 dollars 90 cents. It is to be presumed, that they were apprized very early of the determination of their agents to send the goods to *Rotterdam ;* for, after the 13th of *August*, 1799, they discontinued their drafts, and, from that time, they remained perfectly silent and passive, waiting for the returns of the *Rotterdam* sales, until the 18th of *September*, 1800, when they receive and credit *Leremboure* with the amount of them, and then, for the first time, call on him for the deficiency. This conduct amounted to an affirmance of the acts of *Buildemaker & Co. ;* for, if an agent steps beyond his authority, the principal may, at his election, and as best suits his convenience, either consider him as a wrong-doer, or he may affirm his act, and consider him as a receiver of money for his use. *Willes' Rep.* 407. This latter course the appellants thought proper to pursue, and, therefore, the sound, well known rule of law applies to them, that the subsequent affirmance, by the principal, of the unauthorised act of the agent, is equivalent to an original order. This

ALBANY,
February, 1805.

D. & G. Ludlow
v.
Simond.

conclusion appears to me to result necessarily from the facts. *Buildemaker & Co.* were, generally speaking, the exclusive agents of the appellants, in respect to this mercantile adventure, though, perhaps, under certain circumstances, *Leremboure*, the *cestui que trust*, might have interfered. But it is not requisite, in the view which I take of the subject, to maintain absolutely this exclusive agency. It is sufficient to say, that the transaction was so conducted, that *Buildemaker & Co.* became, in fact, the actual and effectual agents of the appellants, and being so, the appellants, not only, in the first instance, directed, but, in the last instance, affirmed their conduct, by a strict acquiesence, for one year, in the sending of the goods to *Rotterdam*, and then by expressly receiving, at their hands, the proceeds of the *Rotterdam* sales. If the appellants intended to have pursued strictly the course of their contract, they ought, so soon as they were informed that the tobacco was sent off, and that the proceeds of the *Hamburgh* sales were insufficient, to have then called on *Leremboure* with the ascertained deficiency, demanded their note, and left *him* to have pursued, at his own risk, the property, or the agent who had misused it. They would *then* have been entitled to their note, indorsed by *Simond*, for the deficiency, however great it might have been. It is their sanction of the conduct of *Buildemaker & Co.* that makes it their own. By that means they have so essentially varied the terms of the contract, that the surety is no longer holden.

The case would not be altered, were it really true (of which, however, we have not the requisite proof) that the sending the tobacco to *Rotterdam* produced

a better price. This would be a mere accidental re-
sult. It might have been otherwise. But it is the
*principle* in the transaction, the variation of the con-
tract, that discharges the surety. This principle is
stable and uniform, not depending upon the fluctua-
tions of markets. Nor will it do to say, that *Simond*
shall have credit according to the best price at *Ham-
burgh* in 1799, and be holden only for the deficiency.
The principle that releases a surety, under such cir-
cumstances, is not to be modified by such a conces-
sion. It appears that *Leremboure* was insolvent in
*October*, 1800; but how long antecedently he had been
so, does not appear. If the contract had been strictly
pursued, it is possible that the surety might have in-
demnified himself, as early as the beginning of the
year 1800. The variation of the contract may have
thrown him off his guard, and prevented him from
holding fast any fund in his possession, or from tak-
ing other precautions to indemnify himself, until
it became too late to do it with success. As we
cannot know or anticipate the possible injuries
that may ensue from a departure from the terms of
the contract, it is proper that the court should lay
down, and adhere to, a general rule on the subject.

For these reasons I am of opinion, that the decree
of the court below be affirmed with costs.

<div align="center">

*Per totam curiam.*

Judgment of affirmance.